**A–B CATTLE COMPANY et al.**

v.

**The UNITED STATES.**

No. 105–75.

United States Court of Claims.

April 30, 1980.

---

**1100**

John M. Dickson, Denver, Colo., attorney of record for all plaintiffs except The Bessemer Irrigating Ditch Co. Saunders, Snyder, Ross & Dickson, P. C., Denver, Colo., of counsel.

Glenn G. Saunders, Denver, Colo., for plaintiff, The Bessemer Irrigating Ditch Co. Leo S. Altman, Pueblo, Colo., attorney of record. Preston, Altman & Parlapiano, P. C., Pueblo, Colo., of counsel.

Nancy E. Stanley, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and NICHOLS, Judge.

## ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' MOTION TO AMEND THE PETITION

NICHOLS, Judge:

This is a civil action brought pursuant to 28 U.S.C. § 1491 and the fifth amendment to the Constitution, by plaintiffs, A–B Cattle company, et al., against defendant, the United States. The case is presently before this court on plaintiffs' motion to amend their original petition, defendant's opposition thereto and defendant's motion to dismiss for failure to state a claim.

In their original petition as well as in their motion to amend, plaintiffs set forth two theories of defendant's liability. First, plaintiffs allege that defendant failed to pay just compensation for property taken from them in violation of the fifth amendment. Secondly, plaintiffs allege that defendant's actions in relation to the taking violated an express contract between the parties. Here, plaintiffs argue that a Declaration of Taking issued by the Department of the Interior pursuant to condemnation proceedings between the parties constitutes an express contract, imposing the duty on defendant to act in such a way as not to interfere with plaintiffs' property once the taking had occurred. Plaintiffs assert that this duty has been breached and demand compensation.

As will be discussed *infra*, this case has been subject to a long and tortured history. However, because there is but one single issue before us, *i. e.*, whether to grant plaintiffs' motion to amend, an end to such history is in sight. A denial of this motion would be dispositive of the case. For reasons asserted below, we do deny plaintiffs' motion to amend and dismiss the cause of action.

### STATEMENT OF THE CASE

This controversy dates back to June 11, 1969. Defendant initiated a condemnation action in the United States District Court for the District of Colorado as part of the Frying Pan/Arkansas Reclamation Project. *United States of America v. 508.88 Acres of Land*, Civil Action No. C–1480, Plaintiffs' Appendix, Exhibit A, pg. 22. (Hereinafter Plaintiffs' Appendix). This project called for the construction of the Pueblo Dam across the Arkansas River, creating the Pueblo Reservoir. The dam also cut across the Bessemer Ditch, inundating its headgate and first four miles. The Bessemer Irrigating Ditch Company, with its 956 stockholders, operated the ditch. Before the construction of the Pueblo Reservoir, the headgate of the ditch had been on the Arkansas River a few miles west of Pueblo, Colorado. Defendant now supplies water for the Bessemer Ditch by way of an outlet in the dam which feeds water into the remainder of the ditch to the eastward, below the dam. The ditch proceeds in a generally easterly direction through Pueblo and reaches into an agricultural area. The main Bessemer Ditch is now about 35 miles long with 174 miles of laterals.

About 400 of the Bessemer Company's 956 stockholders use the water from the ditch for irrigation of lawns, shrubs, gardens, and trees in connection with their homes. Some of the others use the water to irrigate their truck gardens. The remainder of the stockholders use the water to irrigate their farms.

In its complaint before the District Court in the condemnation proceeding, the United States designated *in rem* the acreage to be taken and named the Bessemer Irrigating Ditch Company and its 956 stockholders as other defendants. It was proposed that the Federal Government would construct an outlet in the dam to deliver the quantity of water appropriated to the Bessemer Company's stockholders under Colorado law, as it has done. The latter parties alleged in their answer that the water they would receive from the new outlet was inferior because it would not contain silt. This, the stockholders said, would make the substitute water inferior, and they demanded compensation for the difference. The reason for inferiority is that silty water sealed the ditch against leakage, while clear water scours the ditch and creates conditions under which 40 percent of the water is lost by

leakage before it ever reaches the users. The water did not, before the taking, become silty on the land taken. It did so upstream on the Arkansas River or tributaries. The part of the ditch taken had been a mere conduit to deliver silty water to the part not taken.

In its Memorandum Opinion and Order entered May 8, 1973, the District Court concluded that the stockholders did have a property right to silty water and that such right had been taken by the government. See Plaintiffs' Appendix, pgs. 60–61. On May 18, 1973, the government filed a motion to reconsider or in the alternative a motion to certify the silt question to the Tenth Circuit. In its September 20, 1973, order, the District Court denied the government's motion to certify while modifying its May 8 opinion. The District Court concluded that the stockholders could be compensated for the loss of silt if it found "severance damages" to be appropriate. The court concluded that such damages would be appropriate if the stockholders could prove that the lands taken and the lands left to the stockholders were a single tract or unit. The District Court expressed its opinion that such proof would not be hard to establish. *Id.* at 64–66.

On April 7, 1975, Bessemer Company and its stockholders (hereinafter plaintiffs) filed suit in this court seeking damages for the taking of their right to silty water. The case was assigned to the trial division. However, upon motion of the parties, the proceedings were suspended in light of the Colorado Supreme Court decision in *Jacobucci v. District Court of Jefferson County*, 189 Colo. 380, 541 P.2d 667 (1975). There the court held that shareholders of a mutual ditch company are necessary parties in a state condemnation action seeking to obtain land and water rights of the ditch company. 541 P.2d at 673. In its May 8 opinion, the District Court had held that the Bessemer shareholders did not have to be joined in that proceeding. Plaintiffs' Appendix at 57.

Believing now that some of its stockholders would have their "severance damages"

adjudicated in District Court and some in the Court of Claims, Bessemer Company filed a motion with the District Court to certify the silt question to the Colorado Supreme Court. Bessemer stated that the reason for its motion was that it did not want the issue of "severance damages" transferred from the District Court to the Court of Claims until it was assured that the Court of Claims would apply the correct Colorado law. Moreover, Bessemer stated that if the District Court decided to transfer the "severance damages" issue to the Court of Claims, Bessemer would request the government to stipulate that it would not assert the defense of res judicata in the Court of Claims. *Id.* at 72–73.

In its June 18, 1976, Memorandum Opinion and Order, the District Court denied Bessemer's motion to certify and held that while the shareholders might be necessary parties, they were not indispensable. Consequently, the June 11, 1969, suit would not be dismissed for nonjoinder. *Id.* at 85–88. The District Court went on to dismiss the claims relating to the silt, which it called a counterclaim, without prejudice to a determination in the Court of Claims. The District Court stated that Bessemer and its shareholders could pursue their claim relating the loss of silt in the appropriate forum, *i. e.*, the Court of Claims and the doctrine of res judicata could not be asserted against them. *Id.* at 92. The latter was accomplished by a protective provision accompanying the June 18 opinion preserving any claim Bessemer might have related to silt loss.

The parties to the proceeding in the Court of Claims subsequently stipulated that the Court of Claims certify the following question to the Colorado Supreme Court:

> Under Colorado law, does the owner of a decreed water right to divert and use water from a natural stream have a right to receive water of such quality and condition, including the silt content thereof, as has historically been received under that right?

Upon review, the Colorado Supreme Court in *A–B Cattle Co. v. United States*, 589 P.2d 57, 58 (1978), distilled the parties' questions into the following issue:

> Under Colorado law, does the owner of a decreed water right to divert and use water from a natural stream have a right to receive the silt content thereof, as has historically been received?

On August 21, 1978, the Colorado Supreme Court answered this question in favor of plaintiffs, but upon rehearing, the court reversed itself on December 13, 1978, this time answering the question in the defendant's favor. *A–B Cattle Co., Id.* at 62. The Colorado Supreme Court subsequently denied plaintiffs' petition for rehearing of this decision on January 29, 1979, and remanded the case back to the Court of Claims on January 31, 1979. Believing the case to be over, the defendant then filed a motion to dismiss for failure to state a claim on April 12, 1979. Plaintiffs responded by filing their present motion for leave to amend their petition in this court. Because of the Colorado Supreme Court decision, plaintiffs no longer assert a property right to the silty water, and would now base their claim on other grounds, at least ostensibly.

## JURISDICTION

We raise, *sua sponte*, what we see as a jurisdictional question present in this case. Plaintiffs have persistently described their claims as for "severance damages." In this court they cannot be so characterized and if they were, we would lack jurisdiction.

▮ In a District Court condemnation under 40 U.S.C. §§ 257, 258a, and Fed.R. Civ.P. 71A (such as the District Court had here), a claim for severance damages to part of a tract not taken is not a counterclaim, is not under the Tucker Act, 28 U.S.C. § 1346, and is not subject to the $10,000 limitation on District Court Tucker Act jurisdiction. These propositions are self-evident when we consider that the proper way of determining damages in true severance cases is the value of the entire tract before the taking, less the value of the tract remaining to the landowner, after the

taking. A claim for severance damages, separately considered, is not a taking claim and is not cognizable under our Tucker Act jurisdiction, 28 U.S.C. § 1491. A district judge who attempted to separate off the severance portion of a Rule 71A case and transfer it to us, would deny complete relief in his own court, which he could grant, and not confer any jurisdiction on us. *See 2.953.15 Acres of Land v. United States*, 350 F.2d 356, 360 (5th Cir. 1965). Our jurisdiction derives from acts of Congress, not from district judges.

The misuse of terminology by plaintiffs in this case apparently derives from their misreading of *Vanada v. United States*, 202 Ct.Cl. 1121 (1973). In that case a district judge, probably erroneously, in a flowage easement case refused to consider the landowner's complaint that defendant had miscalculated the pool area and would flood more land than the Declaration of Taking stated. He awarded compensation for the land described in the Declaration only. We held we could take jurisdiction as to the remaining flooded land, but it was not stated to be, and was not on a severance damage theory. Defendant had simply taken by "inverse condemnation" a piece of land not included in its Declaration of Taking. It was a second taking claim, involving different land.

That case involved taking the same interest in different land. This involves different interest in the same land. The district judge ultimately left open whether the right to receive silty water was a property right. If he assumed it was not, his award for the area taken disposed of the entire controversy. If he assumed it was, it was a separate and distinct interest from ownership of the land proper, possibly belonged to different parties, and could be separated for jurisdictional purposes. He deemed that the silty water claim was a counterclaim, which is inconsistent with its being one for severance damages and he did not call it the latter in his final order, as he had done, inartistically, in prior orders. The United States could easily have taken the silty water, and no land, or land, leaving the

water as it was before. It is not a case where the asserted damage rises out of the intended use *of the land taken.*

We do not regard severance and taking liability as the same. Elements recoverable may be greater in a true severance situation, as they may include consequential damages. In this case, the claim, as finally viewed by the district judge, was in his court a counterclaim under the Tucker Act for a taking not included in the Declaration of Taking. We view it the same way. By this analysis our jurisdiction is saved, but it follows that plaintiffs cannot properly describe their claims as for "severance damages." They are taking claims and subject to the rules applicable to alleged takings. These require that payment be made for property taken, not for mere consequential damages. If the right to silty water is not property, it is not compensable in this court.

### MERITS

We turn now to a discussion of plaintiffs' "new" theories of recovery:

I. The fifth amendment taking theory and

II. The Declaration of Taking theory.

After thorough consideration of all six of plaintiffs' amendments, we deny the motion for the following summarized reasons:

■ I. Plaintiffs allege in amendments one through six that various "takings" have occurred in violation of the fifth amendment. Because we conclude that each of these amendments is ultimately based upon the theory that plaintiffs have a property right to silty water, that theory having been rejected by the Colorado Supreme Court, there can be no fifth amendment taking here. These amendments fail to state a valid theory of defendant's liability and are thus rejected.

■ II. Plaintiffs allege in amendments one through six that defendant has breached an express contract, *i. e.,* the Declaration of Taking, by utilizing the condemned lands in such a way as to interfere with the operation and maintenance of plaintiffs' ditch system. We reject this theory because (1) the Declaration of Taking is not a contract—express or implied; at best, it is a contract implied in law and thus outside the jurisdiction of this court; (2) even assuming the Declaration of Taking was an express contract, the language relied on by plaintiffs is too indefinite to impose the duties on defendant urged by plaintiffs; and (3) even if we assume there was a breach of an "express contract," plaintiffs would not be able to prove damages.

A discussion of each issue follows.

I. *Amendments one through six present no new bases of liability and thus fail to demonstrate that a fifth amendment taking has occurred.*

■ In its December 13, 1978, decision, the Colorado Supreme Court concluded that plaintiffs have no property right to silty water under Colorado law. *A–B Cattle Co., supra* at 62. The legal consequences of this are momentous. The law of eminent domain does not allow compensation for losses of expected benefits from outside the property, not identified as property rights. An example is fish in the sea. *Tlingit and Haida Indians of Alaska v. United States,* 182 Ct.Cl. 130, 389 F.2d 778 (1968) and *Aleut Community of St. Paul Island v. United States,* 127 Ct.Cl. 328, 117 F.Supp. 427 (1954). The expectation of traffic on a public street, outside retail premises, is a second example. *See* 5 Nichols, Eminent Domain, § 16.101[5] (Rev. 3d ed. 1976), and cases cited.

■ Plaintiffs claim what they call "severance damages" but cite no cases, and we believe could cite none, that the expectation of nonproperty benefits flowing from outside the property is made compensable by a taking which severs part of an entire tract, when the taken part was not the source of the benefits.

In amendments one through six, plaintiffs argue that various fifth amendment "takings" have occurred. We conclude that this constitutional claim ultimately must be based upon the theory that plaintiffs have a property right to silty water. Having been

found to have no such right, plaintiffs' fifth amendment claim must necessarily fail. Consequently, we reject amendments one through six and their claim for 20 million dollars of damages because they fail to assert a valid theory of defendant's liability. A discussion of each amendment follows.

In amendments one and four, plaintiffs argue that federal and state statutes and the Declaration of Taking itself required defendant to bring a state court water proceeding approving the change in plaintiffs' point of diversion. Plaintiffs argue that defendant has failed and refused to bring such an action; that if such action had been brought the water court "would have" imposed terms and conditions to prevent plaintiffs' injury; and that defendant's failure to bring such an action constituted a taking for which no compensation has been paid.

We reject this argument without deciding whether, in fact, federal and state laws and the Declaration of Taking required defendant to initiate a water court proceeding. We conclude that even if there was such a duty and even if defendant failed to carry it out, the result was not a fifth amendment taking of plaintiffs' property. By their own statements in the pleadings, plaintiffs admit that their fifth amendment taking theory in amendments one and four is ultimately based upon the absence of silty water flowing through the ditch. Plaintiffs state:

> The United States has failed and refused to bring a proceeding in any Colorado court to obtain such a decree. As a result of such failure, the water delivered by the United States to Bessemer since 12–15–73 has been *inferior* to the water it has heretofore enjoyed and results in a taking by the United States of plaintiffs' property for which *no compensation has been paid.* [Emphasis supplied.]

"Inferior" water is clear water, as plaintiffs point out here in their pleadings:

> If the United States had complied with the statutory obligations and with the obligations it had stated that it assumed in the Declaration of Taking, by bringing

an action in the water court to transfer Bessemer's water rights from their decreed point of diversion on the river to the outlet of the dam, Bessemer would have filed its objection based upon the damage that *clear water* would do to its ditch and farm operation. [Emphasis supplied.]

Thus, by plaintiffs' own admission, their fifth amendment taking theory, asserted as a basis for amendments one and four, ultimately rests on a right to silty water. Because plaintiffs have no such right, amendments one and four are rejected.

Amendments two and five deal with defendant's alleged liability for damages to the remainder of plaintiffs' property arising from its reduction in value allegedly due to the severance of the property taken. This plaintiffs call "severance damages." Plaintiffs argue that the lining of the Bessemer Ditch and its laterals is now being eroded due to the flow of water through the ditch. Stockholders who operate truck gardens and irrigated farms are now receiving less water because almost 40 percent of the water is being lost through the sides and bottom of the ditch. This has the effect, say plaintiffs, of reducing the amount of tillable land and crops while increasing expenses. Plaintiffs demand compensation for these damages in excess of 20 million dollars. We deny this request.

According to plaintiffs' own statements, the destructive erosion of the lining of the ditch and its laterals has been due to the delivery of *clear* water to the ditch. Say plaintiffs:

> The United States took this lining from Bessemer by delivering to Bessemer *   * a *type of water* which removed the lining from the main canal. [Emphasis supplied.]

That "type" of water is clear water as indicated by plaintiffs in this statement from their pleadings, " *   *   * the ripping away of the bottom and sides of the main ditch and laterals [is] a consequence of delivery of clear water *   *   *." Thus, it is our conclusion that there is no need to measure the value of the alleged damages

**1106**

since plaintiffs' theory of liability is and can only be based on the taking of so-called property, i. e., in silty water, which plaintiffs do not own. Thus, amendments two and five cannot be allowed.

In amendment three, plaintiffs rely on the "substituted facility" doctrine, a principle of eminent domain law used for assessing damages. The essence of this doctrine is that a court may wish to award "replacement" costs rather than the fair market value of property condemned by the government. *See United States v. 564.54 Acres of Land,* 441 U.S. 506, 513, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979). Still, there is an initial requirement in the substituted facility doctrine that the condemnee has property taken from him by the government. For the exact reason that we rejected amendments one, two, four, and five, we now reject amendment three: plaintiffs had no right to the so-called property taken by defendant.

In amendment three, plaintiffs assert that prior to the taking, they were owners of an efficient water delivery system consisting of a main ditch and laterals leading from the Arkansas River to the farms, truck gardens, and other places of use. As a result of the taking, plaintiffs contend that defendant required them to accept a substitute delivery system. This system is owned and operated in part by defendant and in part by plaintiffs. Defendant owns a water collection system located on the western side of the Continental Divide which collects western slope water and transmits it through tunnels to the upper Arkansas River. Western slope waters are commingled with Arkansas River Waters and defendant stores in Pueblo Reservoir such commingled waters in an amount equal to that delivered to the upper Arkansas River, less transportation losses from the point of delivery to the place of storage. Defendant owns and operates Pueblo Dam, Pueblo Reservoir and about 1.3 miles of what used to be the Bessemer ditch below the dam and above the "take" line. Defendant withdraws water from Pueblo Reservoir, places it in the part of the Bessemer ditch it now owns and delivers water into

the still privately owned Bessemer ditch system at the government "take" line. Plaintiffs operate the remaining part of the Bessemer ditch system, using settled, temperature-modified water instead of the Arkansas River water they formerly used.

Plaintiffs allege that the combined substitute delivery system operates substantially less efficiently than the former system and is not capable of performing the same functions as the former system. Plaintiffs claim 20 million dollars in damages. We reject this claim.

By plaintiffs' own statements, the alleged damages caused by the substitute delivery system are due to the flow of *clear* water through the ditch and its laterals. Plaintiffs state:

> Because of the alteration by the United States of the *quality of the waters* from that formerly received by Bessemer, the portion of the delivery system now operated by plaintiffs leaks and seeps excessively, can only be operated safely at a substantially reduced head of water, requires increased maintenance, is inefficient, unreliable and wasteful and results in a reduction in the value and amount of crops grown. [Emphasis supplied.]

Thus, plaintiffs' substitute facility doctrine is based on a taking of property, i. e., silty water, to which plaintiffs have no legal right. Amendment three is rejected.

Plaintiffs make two allegations in amendment six. First, plaintiffs argue that prior to the taking, they had a decreed point of diversion on the Arkansas River with a right of access to the natural water of the river. After the condemnation proceedings, plaintiffs maintain that defendant has taken their right of access to the natural water of the river causing damages of 20 million dollars for which plaintiffs demand compensation.

We reject this portion of amendment six for the same reasons we rejected the previous motions—they are all based on the theory that plaintiffs have a right to silty water. By plaintiffs' own statements, the damages which they seek here are based on their claim to silty water. Plaintiffs state:

After the United States took said right of access * * * it has substituted a *quality of water* in amounts which are incapable of providing the economic benefits provided by the natural water of the Arkansas River for use by plaintiffs so that the value of plaintiffs' property has been impaired and diminished in the amount of $20,000,000 as the result of the loss of their right of access to the river. [Emphasis supplied.]

Thus, this portion of amendment six must be rejected as failing to state a viable theory of liability.

As part of amendment six, plaintiffs also argue that under Colorado law, they have a vested right in and are entitled to change the place of their ditch's point of diversion to a location upstream in order to reach the flow of natural water. Plaintiffs point to several Colorado decisions as well as to CRS 1973, § 37–86–111 as express support for their contention that they have such a property right. Plaintiffs claim that because defendant has inundated a very large area upstream from the present point of diversion, they have been foreclosed from exercising their statutory right to alter the point of diversion in order to reach natural river water. Plaintiffs assert that this inundation by defendant has resulted in expensive modifications and adjustments to the use and operation of their system.

While it may be that plaintiffs are correct in contending that they have a property right to alter the location of the point of diversion, we conclude that, because of the Colorado Supreme Court decision denying plaintiffs a right to silty water, plaintiffs' property right to alter the point of diversion is rendered meaningless. The main, if not sole, purpose behind this asserted property right is to reach silty water, to which plaintiffs have no cognizable legal interest. That this is the purpose behind their property right to alter the point of diversion is admitted by plaintiffs in their following statement:

By inundating a very large area upstream from the dam, the United States has effectively denied to Bessemer the

right to a location sufficiently far upstream *to obtain natural river water.* [Emphasis supplied.]

Thus, that portion of amendment six dealing with the right to alter the point of diversion is rejected as failing to assert any genuine basis of liability.

II. *The breach of the Declaration of Taking viewed as a promise is an inadequate basis for granting the motion.*

As a general theory of liability supporting their motion to amend, plaintiffs assert that defendant has breached an express contract embodied in a Declaration of Taking issued May 22, 1969, by the Department of the Interior in the original condemnation proceeding between the parties. Plaintiffs allege that this court has jurisdiction in this matter under the Tucker Act, 28 U.S.C. § 1491.

The particular language relied on by plaintiffs is the second part of the Declaration of Taking, section (c), which reads in part:

* * * The United States shall utilize said lands in a manner as not to interfere with the operation and maintenance of such ditch by the Bessemer Irrigating Ditch Company.

Plaintiffs maintain that this provision has, in fact, been breached, as evidenced by the destructive erosion to the lining of their ditch which has occurred since the defendant's taking. Plaintiffs seek damages for the breach.

It should be noted at the outset that this particular theory of liability was presented to the court by plaintiffs only at oral argument. It is nowhere to be found in plaintiffs' briefs. However, because of plaintiffs' heavy reliance at oral argument on this particular provision, we will not pass over the point in silence.

Plaintiffs assert that the above-quoted language creates an express contract which has been breached by defendant causing damages to plaintiffs. At oral argument, plaintiffs referred to the erosion of their ditch as evidence of such damages.

■ First, we conclude that such Declaration was not a contract, express or implied in fact, as there was no offer and acceptance here. In general, when the United States files its Declaration of Taking and makes a deposit with the District Court in a condemnation proceeding, it is often not aware of who the particular landowners are. To say that this filing constitutes the tendering of an offer to unnamed parties to which a valid acceptance can be made is to distort the meaning of such terms. They have no election whether or not to accept. In *Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977) we state the basic requirements of express and implied in fact contracts, for them to be enforceable here. "A contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. * * It is essential, however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of assent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs." (Footnotes omitted.) By this analysis, a person could not be a government contractor with a right to sue under the Tucker Act, solely by reason of being named by the United States as a defendant in any ordinary type of litigation. Parties to litigation may enter into stipulations that are contracts, but we do not have that here.

Moreover, the case law interpreting 40 U.S.C. § 258a (1931) (the authorizing statute for any Declaration of Taking) indicates that the purpose and effect of a Declaration of Taking is purely procedural in that it entitles both the government and the landowner to an immediate and expedited realization of their respective rights, *i. e.*, the government gets the land immediately and the former owner, once he establishes his former ownership, gets at any rate what defendant concedes the land is worth, and deposits in the registry of the court. This leaves only the difference between the deposit and the claim to remain unpaid until the amount of just compensation is determined. *See United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943) and *Catlin v. United States*, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945). *See also* 6A Nichols, Eminent Domain, § 27.25 (Rev. 3d ed. 1976). It is our conclusion, then, that the Declaration of Taking was not a contract, express or implied in fact and that, at best, plaintiffs have only a contract implied in law which calls for quasi-contractual relief. Such relief is outside of the bounds of this court's Tucker Act jurisdiction. *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925).

Secondly, even if we assume that the Declaration of Taking is an express contract, the language relied on is too indefinite to impose the duty which plaintiffs are, in effect, trying to impose on defendant: that is, the duty to provide silty water to plaintiffs in order to prevent erosion of the ditch. As was the case with plaintiffs' fifth amendment taking theory, this "right to silty water" argument is at the bottom of plaintiffs' Declaration of Taking theory. Not only do plaintiffs not have a right to such water, but the language relied on in the Declaration of Taking is too indefinite to impose the type of duty on defendant that plaintiffs urge. At best, such language imposes only the duty to provide plaintiffs with an equivalent *quantity* of water.

■ Thirdly, even if we assume that defendant breached this so-called "express contract," the damages due to the breach are noncompensable. The damages plaintiffs are suffering here are due to the lack of silty water flowing through the ditch. Since plaintiffs have no right to silty water, the damages incurred from its absence are noncompensable.

Thus, plaintiffs' Declaration of Taking theory, asserted in support of their motion to amend, is rejected.

## CONCLUSION

Plaintiffs' motion to amend its petition is denied and defendant's motion to dismiss

the petition is granted, and plaintiffs' petition is dismissed.